Good morning, ladies and gentlemen. Welcome to the Ninth Circuit. We're delighted you're here. Judge Collins and I are pleased and honored to welcome Judge Paul Kelly from the Tenth Circuit who is sitting with us today by designation, so we thank you for joining us and helping us with our caseload. We have five matters today, one of which has been submitted. We'll do that officially now. That is the case of Cota v. Forensius, USA. That matter is officially submitted. And we'll begin our argument calendar today in the case of Honey Bum, LLC v. Fashion Nova, Inc., Richard Shagian. So I believe Mr. McFarland is up first, please. Good morning. May it please the Court, Jeffrey McFarland, on behalf of Dave Kelly, Honey Bum. This case involves something that's uniquely American, somebody that comes along and says, I see a business that's operating, and I can do it better. I can compete with them. I can make a go at it and get involved in this and make a living at it and start my own company. Honey Bum did that in this case. They took on the 9,000-pound gorilla, or if you want to call it, in the marketplace in Fashion Nova and started to compete with them, and were getting a foothold and doing well until Fashion Nova did one of the more un-American things that happens in this country sometimes, is to try and shut somebody down with a scheme of going out and telling every vendor that they could find that's in this space, don't sell to this competitor of mine. I certainly understand your point from, if you will, relating it in a commercial way. But, of course, we're dealing with law. We are. And under musical instruments, don't you have to show an agreement among the spokes of the hub and spoke wheel, if you will, in order to establish a group boycott? Absolutely. I'm not here to tell you that's not the case. So what I want to know is, is there any direct evidence that that occurred or failing that? Is there something else that you would refer us to to show that you have proven a Sherman Act violation under the musical instruments requirements? Under musical instruments, there's definitely a requirement that the hub and spoke, that the rim has to have an agreement. The question is, what does the level of that agreement have to rise to in order to get to a jury on the question of whether that exists? In this particular case, we would submit that the Monsanto case from the circuit says that, or from the U.S. Supreme Court, excuse me, says that a conscious commitment to a common scheme that's designed to, for an unlawful objective, if you have an unlawful objective, will get you there. And there's evidence. But with respect, at least as I look at it, what you've got is a bunch of people acting in what they consider their best interest, their self-interest. They don't want to run afoul of a fashion nova. But they didn't sit down, from what I can tell, with a fashion nova and say, okay, how can we hurt Honeybaum, how can we have a group boycott? They all seem to have acted just out of their self-interest. That's not the Monsanto case, is it? It is to a certain extent in that it's a conscious commitment to a common scheme. We're not going to, it's not likely that you're going to find a smoke-filled room of folks, you know, and the day it happened, the time it happened, what they served for food and drink, while they discussed how to run Honeybaum out of business, because their biggest client wants them out of business. There's evidence of a conscious commitment to this scheme. There's evidence that they knew and discussed with each other what was going on. Is there any evidence that said that they agreed with what you're calling a scheme, other than just saying that for our best interest, we need to do what fashion nova wants us to do? Well, that they agreed to the scheme. There was a spreadsheet of everybody they went out to. In this case, the defendant did us a solid in providing a list of who they went to to try and compel them not to, and they wrote it down. But there were a number of them. That shows the spokes. Sorry, absolutely does the rim. There was at least two companies where you have been honey punched, which the same person worked at one, moved to the other, and instituted the boycott there, too. There was no, nobody told them at their company to do it. They came over and they said, hey, listen. How does that show agreement? That just shows that one employee who thought it was a good idea when she was at one company thought it was a good idea when she went to the next one. She didn't see agreement. Where's the evidence that that reflected an agreement between the two companies? The evidence was the subsequent bar of honey bum from doing any business because she didn't own the company. The president of the company she went to and the officers of the company she went to and said, hey, listen. Don't sell to honey bum because there's this edict out there from fashion nova that they won't do business with us if you sell to them. They made a decision to join that. They made the conscious commitment to the common scheme in this case, which is not to sell to honey bums. I read brief correct in asserting that you abandoned the wait and see theory. It's not an abandonment of the wait and see theory. It's as discovery proceeded in this case. What we found was that there was evidence, direct evidence in this particular instance of agreement amongst these folks, and in particular with that one honey bunch, and then there was Better Bee and Hot and Delicious, which is in our brief as well, where when we said to Better Bee, you know, we're selling to Hot, or Hot and Delicious is selling to us. They said, no, they're not. We know they're not, indicating that they discussed it. Well, with respect, as my colleague pointed out, what we're searching for is the rim. Yes. We know about this, folks, but I'm struggling to find an agreement, if you will, a collusive agreement amongst these other folks. Now, a lot of them may not have liked the approach that Fashion Nova took, but where's the evidence that they, you called this one filled rim, which, of course, wouldn't occur in California given our anti-social rules, but where's the evidence that they collectively said, we're going to join Fashion Nova, and our intention is to put Honey Bum out of business? As was noted in the Twombly case, if every single person in that rim follows the scheme, and there's evidence in this particular case between at least two companies, and then Better Bee and Hot and Delicious and other two companies, that they know about it, and they're agreeing to it. Well, they know about it, but as you know, two spokes on two different other spokes is not a wheel. It doesn't work. It doesn't hang together. I understand your concern. I understand why you would say there must be. It's kind of a conscious parallelism argument, I gather, but I don't see any evidence that they actually colluded, that they actually agreed as a group. So, if you will, form the rim. What am I missing? We think that the Bonsanto case has the conscious commitment to it, and the evidence of discussion amongst them of adopting it when some different companies agreed to adopt to it, the knowing that other companies aren't doing it, it all shows that conscious commitment to the same scheme. They're not going to, like we know, be in a room and discuss it, and there's cases out there that show that that's not the Apple case, which is another circuit, has an instance where there was no direct evidence that the actual participants in the rim had a discussion and an agreement. There was just evidence that they spoke, and there were 34 telephone calls amongst them that came in as evidence. In this instance, we have more than that. Did you present any evidence that the value of joining the boycott to any individual company was enhanced by a similar behavior by others? The value that it was enhanced of joining? Was it more valuable to the next person who's deciding whether to join that there were 20 people already versus none? Did you present any evidence that having more people enhanced the value for the next one? The evidence, I think, is that they continue to get to do business with Fashion Nova. This is not an instance where. But that's something they each get individually. It doesn't matter whether there's two or 20. Right, right. But as far as the marketplace, it allows them to sell to other people. The benefit is that they can lose their entire sales to Fashion Nova, or they can lose some to one participant who's smaller. And this isn't an instance where these are exclusivity agreements with Fashion Nova. They're exclusionary agreements. Exclusionary where I think you may be on a more solid ground, and that is the contract with Viva USA. Sure. Let's assume, argue when no, that there was tortious interference with that contractual relationship. Do you agree that were we to send that back to the district court, that the damages, the maximum damages that could be received would be for the breach of that or the termination of that contract, as opposed to evidence about the scheme overall, as you would call it? I don't necessarily agree. I believe also that we've put forth evidence of a number of different instances of interference besides just the Viva one. The Viva one was partly performed. Which other cases are you talking about? Which other contracts are you talking about? We put forth a number of purchase orders. The way this business works is these folks walk in the mart downtown. They say, I like that shirt. I like that dress. I want 50 of those. I want 20 of those. And then they say how much. They agree on a price. When can you deliver it? I can deliver it tomorrow or I can deliver it a week from now. And then they go back and they send a purchase order that reflects a writing that reflects their agreement. Okay. In the case of the Viva USA, you actually have a contract. Is there any place in the record where you can assign this to other contracts that were tortiously interfered with from your perspective? Where do we find that? A number of purchase orders that were submitted to the record. I can get you, I will, I guess, save for rebuttal in a couple of minutes. You want to save your time for rebuttal and maybe give us that information. I'll give you the exact numbers on that. But, you know, those agreements are purchase orders. And there's much made of it. Maybe they're at will. Anybody can cancel them. That's not the case. I mean, when these guys agree on price, quantity, delivery, whatnot. Those are executory contracts from your perspective, and they were interfered with tortiously. Correct. Okay. I'll be very interested in seeing, because I only saw the Viva USA. So I'll look forward to hearing about that. All right. And with respect to the last part of my section, it's, as I mentioned, we're not going to find a room of people, and they're not going to admit to it. I mean, the difference between course was only that the parties admitted to it. They said, okay, yeah, we told the Broadway we wouldn't sell to their competitor. But in this particular instance, you know, we'd opposed a lot of people. There was enough that came out, but nobody's wanting to admit that they've done something wrong. You know, I don't find that that would be unusual in my career, is that when you catch somebody doing something wrong, they don't want to admit it. You know, in this particular instance, the person at Fashion Nova who did the spreadsheet, since you've never seen it, had edited it 150 times. We think we have enough as far as agreement to a conscious commitment to the same scheme, which is to run my client out of business, to get past summary judgment in this case and put it to a jury. And I'll reserve the rest of my time. Very well. Thanks. All right. Let's hear from Fashion Nova. Good morning. I'm John Nechterlein on behalf of Fashion Nova and Richard Sabian. Let me start just by describing the – because my opponent started with the facts, I'd like to start with the facts. So Fashion Nova is one of many fast fashion retailers. It's not the largest by any measure she is. There are many other competitors in this market. That's why the district court rejected the Section 2 antitrust claim. Fashion Nova, in this case, observed that a company, Honeybomb, run by an erstwhile friend of Mr. Sabian, had put what looked like a facsimile of Fashion Nova's website up on the web. It used the same look and feel, the same models, the same influencers, the same vendors, the same design. So it took steps, limited steps, to approach 32 out of several hundred vendors, or at least the allegation is for purposes of this summary judgment case, it approached a fraction of the vendors with whom Fashion Nova did business, and it took those steps to avoid free riding on its business model and brand identity. The prevention of free riding is, in fact, a critical efficiency rationale within the antitrust law. So let's talk about the antitrust claim here. So as significant as the court, I think, understands that Honeybomb has not pled a rule of reason claim. It has pled only a per se claim. We know that per se rules don't apply to vertical agreements. The rule of reason applies to vertical agreements under modern antitrust law. We also know that conscious parallelism is not the equivalent of conspiracy. We know that the Supreme Court sharply limited CLORs in 9X versus DISCON and made it abundantly clear, as other courts have noted to that, CLORs applies only in cases where there is a horizontal conspiracy. This is not just a question of whether the alleged horizontal participants admitted to anything. Usually, in fact, always, when you see a horizontal conspiracy, you have at a minimum economic interdependence. So you saw that in the Apple case that my opponent mentioned. You see that in a number of cases where each participant has an incentive to go along with the scheme only if the others do as well. And that was the case in Apple. It's not the case here. By the way, in usable instruments, this court made it clear that interdependence is a necessary but not a sufficient condition for a finding of conspiracy. That you need additional evidence as well. Here, there isn't even economic interdependence. There is no reason to think that any vendor cared whether other vendors also acquiesced. Isn't there any evidence in the record of wait and see where some companies waited to see what others did before responding to fashion over? Not to my knowledge, and that appears to have been waived. Right now, Honeybaum has presented in its opening brief that everyone acted more or less simultaneously. That's their claim. And by the way, if there were wait and see, that would establish only interdependence. It wouldn't establish an agreement. It would be a stepping stone to establishing an agreement, but it would not be itself sufficient as musical instruments holds. So, this case on summary judgment, Max Sucheta defines the applicable summary judgment standards for antitrust cases. That standard is what a reasonable juror finds that is more likely than not that these vendors entered into a horizontal scheme through an agreement rather than acted on their individual self-interest. I gather from what you said earlier, it's your position that even if there were conscious parallelism, that doesn't apply here because this is a horizontal per se claim, right? It's a horizontal per se claim for which you need to prove an agreement. Right. Conscious parallelism doesn't work. Conscious parallelism doesn't work in establishing the threshold question, but there's an agreement to begin with. In this case, the alleged agreement is horizontal. Right. So, if there are no further questions on the antitrust claims. At what point is there a question? In other words, you have 30 people that have agreed with each other or whatnot. At what point does that become a jury question? What does it never become a jury question? You need to show evidence that a vendor agreed with another vendor that would do, with a bunch of other vendors, to do something that wouldn't make sense for them to do each individually, that only made sense for them to do collectively. So, that's when you would have a jury question. You would first have to show economic interdependence, but then you'd need to show that they acted on that economic interdependence by asking each other to acquiesce in the scheme. I gather it's your position that no such evidence has been produced. Correct. There's evidence at most of conscious parallelism between, you know, two vendors. Okay. So, I will turn to the tortious interference claims. So, it's important to distinguish between the two state law claims that Honeybaum has alleged. One is tortious interference with prospective business relations. That requires a showing of independent wrongfulness. We've explained why we believe they have defaulted on that claim by not presenting any sort of, necessarily by not developing any alternative to their Sherman Act section. What was the 16600 theory that they tried to raise at that point? Was it a per se theory as well, or a rule of reason theory? It's good that you ask, because it wasn't either one of those things. What you see, you see no reference to 16600 in the complaint. You see it for the first time in the opposition to summary judgment. But what you see there is two sentences, a quotation of that role in provision, and then a claim that it applies to this case without establishing why it applies to this case. It wasn't an articulation of what the nature of that theory was and how it differed from the section one theory. Correct. And there's no elaboration at all. And as we know from California case law, the courts have limited section 16600 to a rule of reason standard that is directly analogous to the section one rule of reason claim that Honeybaum didn't bring. So allowance of a rule of reason claim at that stage would have reconfigured the case? It would need to have put on a rule of reason case. And, in fact, they have none of the predicates for a rule of reason claim. They haven't defined a relevant market. They've shown zero competitive harm. They've shown no consumer harm. They've shown none of the things that a rule of reason claim needs just to get out of the box. The only tortious interference that troubled me was with respect to a contract, and then specifically the Visa, the Viva USA contract. What's your comment about that? Is that potentially a tortious interference? There was a contract in that case, and arguably your client tortiously interfered with it. I'm not saying it did, but arguably. What's your response to that? So in our motion for summary judgment, we identified the elements of the tortious interference contract claim. One is you have to identify an actual contract. Another is you have to show that the defendant knew about that contract and intentionally caused the third party to breach that contract. There is zero evidence of that here. Which is the element you're saying is missing? Is it knowledge of the specific contract? Yeah, so knowledge and intentional interference with a known contract. All that we see here is, and again, we're conceding this for purposes of this argument, all we see here is a directive from Fashion Nova to Viva Swim not to do additional business with Honeywell. We see nothing in the e-mail exchange that they cite and that this court drew attention to. Nothing in that e-mail exchange or otherwise shows that Fashion Nova knew about an existing contract that had not yet been fulfilled with Viva Swim or that it intended to interfere with them. In fact, the evidence is undisputed that both Mr. Sagan and the relevant buyer at Fashion Nova at the time, they both testified that they did not ask any vendor to breach an existing contract, which stands to reason. Because in this commercial environment, you can ask people to do business with you, but the background assumption is you're going to let them, as the law requires, you're going to let them fulfill whatever binding contracts they have. So in other words, since one of the elements is you've got to know there is a contract and you try to get that breached, you're saying that the evidence here does not show, there's no evidence that Fashion Nova knew of a specific contract and therefore it could not have cautiously interfered with it. Is that correct? Correct. In fact, there is no evidence that Fashion Nova knew that there was a contract that had not been fulfilled and then directed Viva Swim not to fulfill the contract. No evidence of that. And remember, for any given contract, they have to match the existence of a contract with knowledge by the defendant of that contract. Is there anything in the directive, whatever you want to call it, when Fashion Nova communicated with any of these merchants, other merchants, that it was clear that they were only talking prospectively and not with respect to any existing contractual relationships that these entities might already have with Honeybaum? I don't know whether there is such evidence, but they have not identified any evidence in this record that the one contract the court has asked about that Fashion Nova knew about any existing contract that it intended to have Viva Swim breached. I mean, in the deposition of the woman involved, Elaine Tran, she said that she canceled the pending order after she had a phone call with Ms. Morisano. It says, and after you received the phone call from Ms. Morisano, in which she said, do not sell to Honeybaum. You not only wrote this email, but you also canceled the pending order that Honeybaum had in your system, right? Answer, yes. And it goes without saying, but you didn't provide the goods to Honeybaum that they had ordered because of the phone call that you had received from Ms. Morisano, correct? Yes. Why isn't that enough to allow a jury to infer that in that conversation, Fashion Nova asked for the pending order to be canceled? From all we know about that conversation, based on that deposition transcript, Fashion Nova approached Viva Swim and said, stop doing business with Honeybaum. There was no specific reference to a contract for 80 swimsuits, which is what that pending purchase order related to. And there's no reason to think that any given company – there's no reason to infer that any given company would ask a third party to breach a contract that it already had. That's not a reasonable way to construe the conversation as it has been reported to us. In other words, the conversation from your perspective, simply someone could imply that they knew about it, but there's no direct evidence that they knew about it. Yes, there is no direct evidence. Let's assume, arguendo, that there was a contract and that Fashion Nova knew about it and arguably torturously interfered. I gather your position would be that the maximum damages that could be suffered would be whatever occurred that would approximately cause whether we jump that contract alone, and it would have nothing to do with anybody else. Is that correct? That's correct. And I think that's why Honeybaum has not really developed the interference of the contract claim very much. In order to collect for interference with a broader relationship, you would need to assert the other state law claim, which is interference with prospective economic relations. And that requires a showing of independent wrongfulness under some other source of law. They haven't provided that here. Before we move on from the contracts and before I sit down, I do want to point out that there aren't actually purchase orders in this record. For example, the e-mail exchange that we're talking about here relates to a purchase order, and that purchase order is presumably within Honeybaum's possession, but they haven't provided it. Would Fashion Nova have to be aware that there was a specific purchase order in order to allegedly violate torturous interference with a contractual relationship? Yes. It would have to acknowledge as a core element of that particular tort. Would they have to actually have seen the contract or just been told about it or what? I suppose they're being told about a given contract and saying, well, should we breach the existing contract? If the defendant then says, yes, please breach the existing contract, then you probably saw it satisfied at that moment. Why wouldn't the evidence of the purchase order, it's very specific about what was ordered in the dollar amount, and then the evidence that there would have been partial delivery of some of the pieces, why wouldn't that be enough under the commercial code to establish that's a contract? So the purchase order is not in the record. What Fashion Nova has cited is an invoice that was not actually provided, cited to the district court and was not authenticated. The invoice, what's interesting about the invoice is it came two weeks after this e-mail exchange, and it shows that a credit card was charged two weeks after this e-mail exchange, which, if anything, suggests that the contract was actually performed upon. Now, I don't know whether that's the case, and there's mixed evidence in the record on that, but think about this from the district court's perspective. The district court receives a summary judgment opposition in the entirety of what Fashion Nova has to say about its state law claims is contained within one paragraph. The one paragraph contains two unelaborated cites. Neither one of them points to a purchase order. The first one that supposedly cites knowledge doesn't actually cite knowledge. It cites knowledge that Fashion Nova was aware that some vendors. Okay. Your time is up. Let me ask my colleague, does either have additional questions? I think not. So, thank you very much for your argument. Thank you. So, you have some rebuttal time, and first of all, we want to hear about those additional contracts. Yes. The record at 4, electronic record, 585 through 601 and 691 through 769. Say that again. 585 through 601 and 691 through 769. So, you're saying that during all of those page references, those are all contracts that you think were tortiously interfered with? Yes, sir. Wow. Those are evidence, both in email and other writings, of price, quantity, delivery dates. Forgive me, were these executory contracts, in other words, were the elements required under the commercial code to form contracts, were those met in each of these cases? I submit that they are. Okay. Fashion Nova can say we didn't know anything about contracts, first of all. Can you explain the disparity in time that your opposing counsel referenced? Because the email exchange occurs between April 17th and April 25th, but the credit card charge shown on page 537 says May 7th. Right. And this is the long order that has everything and adds up to 1743. Why is this document and that charge weeks after that email exchange? Because the arrangement between the parties was they charged twice a month. They gathered up orders, they gathered up shipments, and as it shipped it charged two times each month. So, the fact that it came after we're not shipping you anymore and we're breaching this contract just gets them paid for what they had shipped at that point, and it's the catch-up. So, does this reflect, then, this 1743, this reflects things that were actually shipped for that price with that charge on May 7th? I believe so. Where is the evidence that there's other things that had been ordered that were not fulfilled? The email exchange is for the things that were the 80 pieces where only five were shipped. There were prior interactions between these two businesses as well. Do you have any order in the record that shows what was requested and not fulfilled? Just the email reflecting the fact that they had agreed to an order. No, I don't have anything else in the record. With respect to the items that were on there, they were items that my clients were aware from the vendor that weren't being offered by Fashion Nova until such time as the order was canceled, and then they were being offered by Fashion Nova. Let me just, your time is up. Let me ask my colleague, does either have additional questions? I'm sure we could talk to you for a long time, and I'm sure you'd give us lots of important information, but we'll look to your brief, and thank you both for your argument. The case just argued is submitted. Justice, thank you very much for your time. Thank you.
judges: Kelly, SMITH, COLLINS